LEWIS C. OVERTON ET AL., APPELLEES, V. CHARLES W. SACK ET AL., APPELLANTS.

FILED DECEMBER 3, 1915. No. 18317.

1. **Deeds: CANCELATION: FRAUD.** Before a court of equity will set aside a deed obtained by fraud, or imposition, practiced upon a person of weak mentality, it will require a return of the purchase money paid, or, if that cannot be done, will make such other order as will place the purchaser in substantially the same condition as he was in at the time the deed was made.

2. **Limitation of Actions: BEQUEST.** A specific money bequest, resting as a lien upon real estate in the hands of a residuary devisee, is barred after the lapse of ten years from the time the right of action thereon accrued.

APPEAL from the district court for Sarpy county: HARVEY D. TRAVIS, JUDGE. *Modified and remanded, with directions.*

*Stout, Rose & Wells* and *Matthew Gering,* for appellants.

*William R. Patrick* and *Anthony E. Langdon, contra.*

MORRISSEY, C. J.

June 16, 1885, William Overton died, testate, seised of certain lands in Sarpy county. He devised to the widow the land herein in controversy, during her natural lifetime, and provided that at her death it should descend to his son, William B. Overton, subject, however, to the payment of $200 each to his sons, John G. Overton, Lewis C. Overton, North L. Overton, and to his daughter, Martha C. Sack. The will was duly filed and admitted to probate in 1885, and in December, 1887, the accounts of the executor were approved and he was duly discharged by the county court. The widow, Catherine Overton, died May 11, 1901. July 15, 1907, Lewis C. Overton filed a petition in the probate court alleging the nonpayment of the legacies, and procured the appointment of an administrator with will annexed. September 3, 1910, the administrator filed his re-

port showing that no property had come into his hands and praying for his discharge. On the day set for hearing the court entered a decree finding it the duty of the administrator to collect the bequests, and that on such collection and payment an order of discharge would issue. This appears to end that proceeding.

From the death of William Overton in 1885 until the death of his widow, Catherine Overton, May 11, 1901, the widow and her son William B. Overton occupied the premises, and from the death of the widow until August 11, 1911, they were occupied by William B. Overton. On the last named date William B. Overton executed a deed of conveyance of the real estate to defendant Edgar R. Kobler, and, on the same day, Kobler executed a deed to the defendant Sack. Soon thereafter William B. Overton died intestate. This action was brought primarily for the cancelation of these deeds.

The plaintiff Lewis C. Overton is a son of William, and a brother of William B. Overton, and the other plaintiffs are also heirs of the deceased William and William B. By their petition, plaintiffs allege that shortly after the death of Catherine Overton they entered into a mutual agreement with William B. Overton that, in consideration of their forbearance to prosecute the collection of the legacies due them under the will of William Overton, William B. Overton should not alienate or incumber the real estate, and should die intestate, to the end that his property should descend to the legatees, or to those entitled to the property by right of representation, they being the sole heirs at law of the said William B. Overton; that, relying upon this agreement, the legatees forbore the prosecution or collection of the several amounts due under the will; that August 11, 1911, the defendants Edgar R. Kobler and Charles W. Sack, conspiring together for the purpose of unlawfully securing the property of William B. Overton, by the exercise of deception, fraud and undue influence, procured the execution of the deed from William B.

99 Neb. 5

Overton to Edgar R. Kobler; that at the time Overton was mentally incompetent to execute and deliver a deed, and also that Sack and Kobler well knew of the oral agreement whereby he had agreed to die intestate without incumbering or alienating the real estate; "that, under the importunity, advice and 'direction of the defendant Kobler, said William B. Overton, having in his possession the sum of about $5,000, was, in the nighttime, taken by said Kobler and conveyed to a lonely spot in Douglas county, Nebraska, where the said William B. Overton was, during said night, murdered and robbed of said money, which was thereby lost to the plaintiffs and other heirs at law of said William B. Overton." It is also alleged that the consideration, $4,000, was grossly inadequate, and that the land was of the value of $5,000. There was a prayer that the alleged oral agreement be enforced and held valid; that the deeds be declared null and void; that the title to the land be quieted and confirmed in the plaintiffs to the extent of their interest as heirs of William B. Overton, or, in the event that the court did not so 'decree, that the plaintiffs be held to have a lien upon the premises for the amount of the bequests contained in the will of William Overton, together with interest thereon from the date of the death of Catherine Overton, May 11, 1901. Minor heirs, through their guardian *ad litem*, intervened, and by cross-petition set out all the matters contained in plaintiff's petition, and in addition prayed for a construction of the will of William Overton.

Defendant Charles W. Sack, by answer, denied all allegations of fraud and duress; admitted the purchase of the 'land, and the chain of title by which he held; and alleged that through Edgar R. Kobler, his agent, he purchased the same for $4,000, its full merchantable value; denied that he had any knowledge, part or participation in any artifice, trick or fraud employed by Kobler; denied that he had any knowledge or information that William B. Overton was incompetent to transact business; alleged that in making the purchase he acted in good faith; denied

that the murder and robbery were incident to or connected with the real estate transaction, or that they were in any way attributable to him; denied that either William B. Overton, during his lifetime, or any of his heirs or representatives, ever tendered or offered to return the $4,000 which he paid for the land; alleged that the estate of William Overton was fully administered and the executor discharged December 6, 1887; that more than ten years elapsed between the date of the decease of Catherine Overton, May 11, 1901, and the commencement of this suit, October 24, 1911, and that the legacies mentioned were barred by the statute of limitations. The defendant Edgar R. Kobler, filed a general denial.

The findings of the trial court, so far as material here, are: That the legacies mentioned in the will of William Overton were never paid; that in making the purchase the defendant Kobler acted as the agent of the defendant Charles W. Sack; that William B. Overton "was an old man, weak in body and mind, living the life of a recluse, and that said fact was well known to the defendants Kobler and Sack;" that by representing to Overton that he was about to be arrested on the charge of arson he was put in great fear, and while in a highly agitated state of mind and wholly disqualified to act rationally as to his property, and "probably insane," he made the deed, and that Sack was fully cognizant of these facts, and that these representations were false; that following the execution of the deed, and on the same day, the defendant Kobler conveyed Overton, who then had at least $5,000 on his person, to a lonely spot in Douglas county, "where said William B. Overton by some person or persons, was murdered and robbed of his money." The court makes the further finding that on August 11, 1911, defendant Kobler possessed himself of all the money of William B. Overton except $35; that the value of the land was $5,000; that the evidence did not sustain plaintiff's claim of an oral agreement on the part of William B. Overton to die intestate. He decreed that the deeds be set aside as fraudulent; that the legacies men-

tioned in the will of William Overton be established as liens upon the real estate, and the land to be sold to satisfy the same, and, after the payment of the legacies, the proceeds be divided among the heirs; that the defendant Martha C. Sack pay into court $200 which the defendant Kobler had given her immediately following the disappearance of William B. Overton; that Kobler pay into court $4,800, $4,000 of which to be paid to Charles W. Sack, and the remainder to be divided among the heirs of William B. Overton.

Overton was an eccentric character, who had spent nearly all his life on this little farm. After the death of his mother, which occurred in 1901, he had lived alone in a small cabin, and, though surrounded by relatives, he seldom visited them, and they rarely called on him. The land lay adjoining the farm owned by the defendant Sack, who was a relative but did not enjoy his favor. The defendant Kobler, a young man, who was also related to Overton, and on friendly terms with him, discovered that the farm might be purchased. He went to Sack and told him it could be bought for $3,000. Sack at once agreed to take the property and to pay Kobler $300 commission for making the purchase. Kobler returned to Overton only to find that he had raised the price to $4,000. Finally a contract was closed at the larger figure, but some modification was made between Sack and Kobler as to the amount of Kobler's commission. Sack went to his local banker, and, by executing a mortgage on the farm which he then owned, arranged with the banker to pay Overton the purchase price. Kobler and Overton went to the bank, Overton executed a deed of the property to Kobler, believing that Kobler was the real purchaser, and immediately thereafter Kobler deeded to Sack. The banker suggested to Overton that he take bank paper, but on Overton's insistence that he would accept nothing but cash the money was paid over. Overton then went to the home of a cousin in Springfield. He put the currency in a small sack, which he wore around his neck, and the gold and silver

into a tin bucket; he having about $5,000 all told. About 6 o'clock that evening, without waiting for supper, he left the home of this cousin, in company with Kobler, taking with him all of his earthly belongings. It is insisted by plaintiffs, and we think fairly shown by the evidence, that Overton had been led to believe that the sheriff was about to arrest him on a charge of burning some hay stacks, and that it was necessary for him to depart at once in order to avoid arrest. They drove to the town of Millard, where they were last seen together. About thirty days later the body of William B. Overton was found, and all of his money was gone, except $35, which was overlooked by the party who murdered and robbed him. The circumstances point strongly to Kobler as the perpetrator of this heinous crime.

Immediately following the execution of the deeds and the payment of the money, Sack met the plaintiffs in the town of Springfield, and told them of the transaction. It is insisted by the plaintiffs that he misled them as to Overton's whereabouts, but it is not contended that they made any objection to the sale or any claim to an interest in the property. Overton went freely about the streets of the little town during the afternoon, and the money was paid over by the banker in the regular course of business.

Having reached the conclusion that at the time Overton executed the deed he was of weak mentality and that the deed was obtained by fraud or imposition, practiced upon him by Kobler, it is unnecessary to discuss the testimony on which the trial court based its finding. But it is not claimed that Sack had any part in the murder or robbery of Overton, and the decree of the trial court directing Kobler to pay $4,000 into court for the benefit of Sack, the amount he had paid for the land, is as conclusive as though he had made a special finding to that effect, that the trial judge believed that Sack was in no way connected with the felonies.

Sack not being in any way connected with what occurred after the execution of the deeds and the payment of the

money, will a court of equity grant plaintiffs the relief prayed without a return, or an offer to return, the money paid? In reply to this question, appellees say, "Sack having availed himself of the real estate, which he received from Kobler, he is likewise charged with all the instrumentalities employed by Kobler to effect and secure the conveyance of the land to him by Overton," and cite, though under incorrect title, *McKeighan v. Hopkins,* 19 Neb. 33, and *Osborn Co. v. Jordan,* 52 Neb. 465. These cases merely lay down the familiar rule that a principal may not ratify the unauthorized act of his agent in so far as it operates to his advantage and repudiate those acts in so far as they impose burdens. Sack is not accused of entering into a conspiracy with Kobler for the commission of a felony. If Kobler be guilty of these crimes, they were perpetrated after his agency had ceased; they were beyond the scope of his employment, and Sack cannot be held accountable therefor in any degree. At the time Sack employed Kobler to negotiate the purchase, negotiated the loan with the bank, arranged for the banker to draw the deed and make the settlement with Overton, he surely had no reason to suppose that Overton would take this money in cash and go out unarmed in the night season, thus leaving himself subject to the assault that was made upon him. He could not reasonably contemplate that Kobler or anybody else would rob and murder him, and, in the absence of any proof that he might have contemplated these things, we must adhere to the rule requiring restoration of the *status quo* as a condition of decreeing the cancelation of the deeds. The appellees contend that Kobler robbed Overton of his money, and thereby made it impossible for plaintiffs to tender a return of the purchase price, and that Sack must look to Kobler and the warranties in his deed for reimbursement, and that Sack deceived plaintiffs as to the whereabouts of Overton and deprived them of the opportunity to quiet his fears and protect either him or his money, citing *Meyer v. Fishburn,* 65 Neb. 626. In that case the court held to the general rule that a party who seeks

to rescind a contract entered into fraudulently or induc-
e'd by undue influence must return, or offer to return, the
property acquired by such contract within a reasonable
time, and so place the adverse party *in statu quo,* but held
that there is an exception to that part of the rule requiring
a return of the property where the party guilty of fraud
and undue influence, and as a part of the general wrongful
design, has by advice or interference induced the other par-
ty to part with his property, and held that in such case a
tender of the value of the property received is sufficient,
and decree'd the defendant a lien upon the premises for
an amount equivalent to the value of the property trans-
ferred.   In the instant case Sack neither counseled nor ad-
vised Overton to take the money and lay himself open to
robbery and murder, but, on the contrary, he arranged
to have it paid by the banker in his bank, where he might
reasonably suppose Overton would leave it until drawn
out in the regular course of business, and it cannot be
said that the robbery was any part of the design or scheme
contemplated in the purchase of the real estate.

We are convinced that the court was warranted in find-
ing that the oral agreement pleaded was not proved, but
was in error in establishing the legacies left under the will
of William Overton as liens upon the real estate.   Wil-
liam Overton died in 1885, and his executor was discharg-
ed in 1887.   Twenty years elapsed thereafter before any
steps were taken looking to the collection of the legacies.
Even at that late date these measures consisted only in
the application to the county court for the appointment of
an administrator with the will annexed, which appoint-
ment was made.   And some three years later this admin-
istrator filed a petition asking for a final settlement of his
account.   Notice was published, and the county court en-
tered a decree' finding that the only duty devolving upon
the administrator was the collection of the bequests, and
that they were a charge upon the real estate, and that upon
the collection thereof the administrator would be discharg-
ed.   No further steps were ever taken.

The guardian *ad litem* has asked that the payment of these legacies be decreed to be a condition precedent to the vesting of the title in William B. Overton, but a reading of the will itself at once demonstrates that they never were anything but liens upon the real estate, and the only question to be determined in relation to the legacies is whether the statute of limitations has run against them. In *Klug v. Seegabarth*, 98 Neb. 272, this court held: "An action to enforce the lien of a specific money bequest upon real estate in the hands of the residuary legatee is not barred until ten years from the time payment becomes due." Taking the view most favorable to the contention of appellees, namely, that the bequests became due and payable upon the death of the widow, still more than ten years had elapsed before this suit was brought, or before the deeds were executed, and the legacies were barred by the statute of limitations.

So much of the decree as directs Martha C. Sack to pay $200 into court is entirely beyond the issues and is set aside. Kobler has not appealed from the judgment directing him to pay $4,800 into court, and therefore as to him the judgment will be affirmed, but modified, however, by striking out that clause directing the payment of $4,000 thereof to Charles W. Sack, and the whole amount, if collected, shall be credited to the estate of William B. Overton, deceased.

Having reached the conclusion that the deeds ought to be canceled and set aside, but that Sack is entitled to a return of his money, the cause as to him is reversed and remanded, with directions to the court to enter a decree setting aside the deeds, and to make an accounting of the value of any permanent improvements Sack may have made on the premises, and credit him with this amount, together with the original purchase price, with interest thereon at the rate of 7 per cent. per annum from date of payment, and from the amount so found deduct the value of the rents and profits of the real estate while in his possession, and establishing the amount so found to be

Union P. R. Co. v. Troupe.

due as a first lien on the real estate.    If the legal represen-
tatives of William B. Overton, deceased, fail to pay into
court the amount so found, within 20 days from the en-
try of the decree, the real estate shall be sold for the pay-
ment and satisfaction thereof, the surplus, if any, to be
paid to the legal representatives of William B. Overton,
deceased.

MODIFIED AND REMANDED, WITH DIRECTIONS.

SEDGWICK, J., concurring.

I think that the judgment is rightly reversed, but I do
not think it should be left entirely at the option of the
plaintiffs to cause a sale of the property.

ROSE and HAMER, JJ., not sitting.